**UNITED STATES of America,**

**v.**

**BIG APPLE BAG COMPANY, INC., Huan Kung Teng, also known as "Danny Teng," and "Wei Kang Teng," also known as "Richard Teng," Defendants.**

**No. 03–CR–781 (NGG).**

United States District Court, E.D. New York.

May 7, 2004.

Nicholas G. Kaizer, Law Offices of Richard Ware Levitt, Gerald B. Lefcourt, New York City, Michael Daniel Weil, Brooklyn, NY, for Defendants.

Carrie Capwell, Brooklyn, NY, for Plaintiff.

*MEMORANDUM & ORDER*

GARAUFIS, District Judge.

On February 24, 2004 this court held a *Franks* hearing to determine whether Federal Bureau of Investigation ("FBI") Special Agent Elvin Quinones made deliberately or recklessly false statements in a warrant affidavit. On February 25, the court issued a decision finding that Quinones had made such deliberately or recklessly false statements, statements that were material to the issuing of the warrant. As a result, the court suppressed all of the evidence that the government seized from the defendants' warehouse pursuant to the warrant. After initially moving for reconsideration of that decision, in its reply brief the government conceded that it would not contest the court's decision to suppress the evidence seized pursuant to the warrant. In that reply brief the government instead argued that certain of the

evidence seized from the warehouse could be admitted at trial without reference to the warrant, as items properly seized under the "plain view" exception to the Fourth Amendment. For the reasons explained below, the government's motion is granted in part, and some of the evidence seized from the warehouse is admissible at trial.

## I. FACTUAL BACKGROUND

On May 6, 2003 a group of approximately seven law enforcement officers went to a warehouse in College Point, Queens. February 24, 2004 Hearing Transcript ("Tr.") at 126–27, 166. Their task was to execute an arrest warrant for Danny Teng, a fugitive that one of the officers, FBI Special Agent Elvin Quinones, had seen outside the warehouse the day before. *Id.* at 32,[1] 126. Quinones and FBI Special Agent Neil Donovan approached the man they believed to be Danny Teng outside the warehouse. *Id.* at 167. The man denied he was Danny Teng and produced photo identification with another name, but he indicated to the officers that Danny Teng was inside the warehouse. *Id.* Together with this man, Quinones and Donovan entered the warehouse. Tr. at 170.

The warehouse is rectangular in shape and between approximately 6,000 and 10,000 square feet. *Id.* at 127, 150, 172. All of the agents entered the warehouse at one end. *Id.* at 172. There was a main corridor or "open area" free of any obstructions along the center of the warehouse. *Id.* On either side of this corridor were rows of stacks of boxes. *Id.* There were more than three or four rows of boxes, though it is unclear precisely how many rows there were. *Id.* These stacks were approximately nine feet high. *Id.* at 127. The rows of boxes formed aisles that were perpendicular to the main corridor. *Id.* at 150. At the end of the main corridor, opposite the entrance utilized by the agents, was an office with glass windows. *Id.* at 127. Agent Donovan estimated that it would take approximately thirty seconds to walk from the entrance where the agents entered the warehouse to the office in the back of the warehouse. *Id.* at 172.

Donovan ordered Special Agent James Scartozzi and other officers to follow him inside the warehouse, in order to perform a security sweep for the officers' safety. *Id.* At 152. During cross-examination, Special Agent Scartozzi explained that the agents had safety concerns, because they were executing a fugitive arrest warrant:

> Q: Was there anything that you knew about the person you were attempting to apprehend that suggested that person was dangerous?
>
> A: I do not believe we had any information, before we executed the arrest, to indicate that he had a propensity for violence or was any more dangerous than any other person we arrested.
>
> Q: It's fair to say that in total, there were at least seven agents, detectives and marshals involved in this particular event; correct?
>
> A: Yes, that would be correct.
>
> Q: And as you sit here now, do you have any idea why such a large number of personnel were required to attempt the arrest of somebody as to whom there apparently was no violent propensity?
>
> A: Yes, I do.
>
> Q: What was that?

1. In the February 25 Order, I found that "Agent Quinones was not a credible witness." 2/25/04 Order at 4. In this Order, I do, however, occasionally cite Agent Quinones' testimony where (1) the testimony does not specifically relate to what "drug paraphernalia" he saw or when he saw it, and (2) his testimony is consistent with that of Special Agents Donovan and Scartozzi.

> A: In our estimation, that is not a large number, that's an appropriate number of law-enforcement officers to effect an arrest. Anytime you're going to take someone into custody, there are several risks involved, and we always want to bring more persons as opposed to less persons. If we bring more people than we need, that's not a problem. However, individuals can turn violent. Persons with no previous history of violence may become unstable when they are about to lose their freedom. In a case where we have several individuals, we have the best possible circumstances for them to cooperate, and if they are compliant, nobody gets hurt.

Tr. at 166. Donovan and Quinones walked straight towards the internal office at the rear of the warehouse, where they found another man. *Id.* at 54, 151.

During his first five to seven minutes inside of the warehouse Agent Scartozzi performed a visual security sweep of the building for additional people and for weapons. *Id.* at 144. He did a visual inspection, without touching anything, of the long rows created by the high stacks of boxes. *Id.* at 127–28, 138–39. Special Agent Scartozzi was "just looking down the rows for people." *Id.* at 139. During the course of this visual sweep he saw overstuffed or open boxes, as did the other officers, containing small plastic bags of the type used to sell retail amounts of narcotics. *Id.* at 128. Scartozzi also saw closed glass tubes of varying sizes and shapes with different colored caps. *Id.* at 128. On a table on the left, in one of the corridors between the rows of boxes, Scartozzi saw a metal desk. *Id.* at 129. On top of the metal desk was a brown paper packet containing about 100 glass crack pipes, near boxes containing small, metal mesh filters that are used with crack pipes. *Id.* Scartozzi's sweep included the office, where Scartozzi saw papers for rolling marijuana "blunts." *Id.* at 130.

Within about fifteen minutes after entering the warehouse, Donovan and Quinones established that the man outside the warehouse truly was Danny Teng, despite his denials, and that the second man was Richard Teng, Danny Teng's son. *Id.* at 151, 153. Once his identity was ascertained, Danny Teng was arrested pursuant to the arrest warrant and taken away. *Id.* at 153–54. Based upon discussions the officers had with the U.S. Attorney's Office, Richard Teng was also arrested, about an hour or two later. *Id.* at 153. The agents secured the warehouse and obtained a search warrant from Magistrate Judge Marilyn Go. Pursuant to that search warrant, the Federal Bureau of Investigation seized essentially the entire contents of the warehouse and has maintained possession of the property at an undisclosed location. The instant prosecution for federal drug paraphernalia crimes of the Tengs and Big Apple Bag Company, which occupied the warehouse, followed.

## II. DISCUSSION

The government argues in its reply brief that the Court "overlooked" the fact that much of the evidence was in plain view and therefore admissible regardless of the warrant. Government's Reply Letter at 1.[2] In

2. The court did not "overlook" this argument, because it was not presented by the government at the original hearing. The government's arguments at the February 24 hearing concerning "plain view" were part of an effort to convince the court that the warrant was valid, not to convince the court that the evidence could be admitted apart from the warrant. The government first made this argument, in a cursory manner, at the end of its initial motion for reconsideration. It was only in its reply brief that the government for the first time made a detailed argument concerning the plain view exception to the Fourth Amendment.

support of this plain view argument the government makes the following assertions: (1) that Special Agent Scartozzi lawfully entered the warehouse on May 6, 2003 before performing a "security sweep" as defined in *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), and (2) that Scartozzi had probable cause to believe that many of the things he saw in the warehouse were evidence of a crime. Citing *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the government argues that under these facts the situation falls within the plain view exception. The defendants make four arguments in response: (1) that the government waived its right to make this plain view argument; (2) that the defendants did not have the legal right to enter the warehouse; (3) that Scartozzi did not have sufficient legal justification to conduct a "security sweep" as described in *Buie;* and (4) that on the factual record before the court the government cannot identify the particular items that could be admitted under this plain view exception. The court addresses these arguments in turn.

### A. The Government's Plain View Argument Was Not Waived

The court sympathizes with the defendants' complaint that they were forced to respond to meritless arguments submitted in the government's initial motion for reconsideration, arguments that the government itself later dropped, before facing new plain view arguments that were never made at the February 24 hearing. The court finds, however, that the government has not waived its right to make this argument. The fact remains that until the court issued its order of February 25, the government did not know that it would not be permitted to use the evidence obtained pursuant to Magistrate Judge Go's warrant. The government does not generally have the burden before trial of proving that its evidence may be admitted; rather, defendants may challenge the admissibility of proposed evidence for whatever reason, just as these defendants did. Therefore, until the court issued its February 25 order the government was not "on notice" that it could not introduce the evidence seized pursuant to the warrant.

At oral argument on April 14, the government asserted that its motion was more like a motion *in limine,* in which the government asked the court to determine which evidence it could introduce, now that evidence could not be introduced pursuant to the warrant. While this assertion would have made more sense if the government had simply made an actual motion *in limine* directly after the court's February 25 order, rather than first making an admittedly fruitless request for reconsideration of that order, the government did make a cursory argument concerning this issue in its initial briefing papers. That argument can be construed as a motion *in limine* on this subject, and by virtue of the court's later giving the defendants extra time to brief the issue after it was raised more fully in the government's reply brief, the defendants were on notice that the court was prepared to entertain the argument on its merits. The government deserved at least one opportunity, after the suppression order of February 25, to argue that evidence seized from the warehouse was admissible under some exception to the warrant requirement of the Fourth Amendment. The court construes the government's "Motion for Reconsideration" as its attempt to promptly take advantage of that opportunity.

Finally, the court notes that there is very little precedent for the proposition that the government can waive an evidentiary argument before trial. The defendants cite only one published Eastern District of New York case for this proposition.

*See United States v. Gross,* 2002 WL 32096592 (E.D.N.Y. Dec.5, 2002). Under no circumstances would this court hold that a defendant in a criminal case would have waived an evidentiary argument before trial. In the interests of fairness, the government and the defendant must be afforded the same opportunity to challenge or assert the admissibility of evidence.

**B. Special Agent Scartozzi Was Lawfully in the Warehouse When He Made the Relevant Observations**

The court finds that Agent Scartozzi properly entered the warehouse. The defendants strenuously argue that the agents did not have probable cause to enter the warehouse. At oral argument and without identifying any authority, the defendants argued that the agents needed probable cause to enter the warehouse in order to execute the arrest warrant. In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe the suspect is within.*" *Id.* at 603, 100 S.Ct. 1371 (emphasis added). This has been interpreted to "require[ ] a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." *See United States v. Magluta,* 44 F.3d 1530, 1533 (11th Cir. 1995). After substantial independent research, this court has failed to locate any cases addressing the standard for entering a place of business in the process of executing an arrest warrant. Given that the home receives greater protection under the Fourth Amendment than places of business, the information that the Fourth Amendment requires the agents to possess in order to have entered the instant warehouse can be no greater than the "reasonable basis" that would have been required had they arrested Danny Teng in his own home. *See Payton,* 445 U.S. at 583–89, 100 S.Ct. 1371 (discussing the sanctity of the home in contrast to other spaces); *United States v. Haqq,* 278 F.3d 44, 54 (2d Cir.2002) (Meskill, *J.*, concurring) ("While we are protected from unreasonable government intervention in our business, automobiles and in public, the protection we enjoy in these situations is far less than the ultimate protection we receive in our homes"). Because I find below that the agents had a reasonable basis for believing that Teng would be present in the warehouse, I need not determine the precise standard that governs officers' entry into a business for the purpose of executing an arrest warrant.

In this case, Agent Quinones testified that when he approached the man outside the warehouse whom he believed to be Danny Teng, the man said he was not Danny Teng and produced photo identification with a different name. Quinones testified that the man indicated that Danny Teng was inside the warehouse. While in its February 25 order the court severely questioned Agent Quinones' credibility about a number of issues relating to the search warrant, the court finds that these particular statements were accurate. Most importantly, these particular statements were corroborated by the testimony of Special Agent Neil Donovan, whom I do find credible. Tr. at 167–68. The agents, who were armed with an unquestionably valid arrest warrant for Danny Teng, had reliable information indicating that Danny Teng would be in the vicinity of the warehouse on May 6, 2003. The fact that a man outside the warehouse told them that Danny Teng was inside the warehouse gave them a sufficient basis for entering

the warehouse in order to execute the arrest warrant for Danny Teng.

The defendants allege that notwithstanding the man's statement that Danny Teng was in the warehouse, Agent Quinones knew that the man with whom he was speaking—outside the warehouse—was in fact Danny Teng. They point to the court's comment in the February 25 order that Quinones was not credible when he said that "he truly doubted that the man he stopped outside the warehouse on May 6 was in fact Danny Teng (a fugitive from justice), merely because the man denied he was Danny Teng." February 25 Order at 7.

This observation by the court, however, does not lead to the conclusion that the agents were not legally entitled to enter the warehouse to search for Danny Teng. The referenced observation in the February 25 order does not constitute a finding that Quinones actually believed to a certainty that the man outside the warehouse was Danny Teng; rather, it was simply a comment on Quinones' failure to make the obvious admission that the mere fact that the man outside the warehouse denied he was Danny Teng should not have been sufficient, on its own, to cause Quinones (who had previously positively identified Danny Teng from a photograph during surveillance at the warehouse the day before) to suddenly become certain beyond any doubt that the man outside the warehouse was not Danny Teng. For the man also produced photo identification with a name different from Danny Teng's name (neither "Danny Teng" nor "Huan Kung Teng"), a separate reason for Agent Quinones to doubt his earlier conclusion that the man outside the warehouse was Danny Teng.

More importantly, notwithstanding the fact that the agents should have remained (and did remain) suspicious that the man outside the warehouse was Danny Teng, the agents reasonably and simultaneously should have had (and did have) some level of doubt about whether the man really was Danny Teng. There is no question that the agents had the reasonable basis for believing that Danny Teng was inside the warehouse that was required in order to enter the warehouse: a confidential informant had advised Quinones that Danny Teng might be at the warehouse (Tr. 30); Quinones had observed an individual who appeared to be Danny Teng carrying boxes outside the warehouse the day before the agents arrived at the warehouse; and an individual outside the warehouse had indicated that Danny Teng was inside the warehouse.

### C. Scartozzi's Protective Sweep Was Permitted Under Buie

■ Agent Scartozzi's "protective sweep" was permissible under *Buie.* The Court wrote in *Buie* that "[w]e also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. 1093. Such a sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. The sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093.

This "places from which an attack could be immediately launched" exception to the Fourth Amendment fits this situation well. As discussed above, the agents had the right to enter the warehouse, in order to execute the arrest warrant for Danny Teng. When the agents first entered the

warehouse, Danny Teng pointed to Richard Teng and said that Richard Teng was actually Danny Teng. Tr. at 174. Agents Donovan and Quinones approached Richard Teng and attempted to ascertain his identity. *Id.* While Donovan and Quinones were ascertaining Richard Teng's identity, they were standing in the "open area." *Id.* It took "a matter of minutes" to ascertain Richard Teng's identity. *Id.* at 176. From the time that Donovan and Quinones entered the warehouse, they passed by a number of rows of stacked boxes and proceeded to have a conversation with a suspected fugitive in an "open area." Throughout this period, an attack could have been launched from any of the aisles that Donovan and Quinones passed.

In most of the published cases that this court has reviewed, the space from which an attack can be immediately launched is a relatively small space. *See e.g., United States v. Lauter,* 57 F.3d 212, 213, 216–17 (2d Cir.1995) (holding that protective sweep was permitted of adjacent room of apartment where apartment "consisted of two small rooms"); *United States v. Vargas,* 2003 WL 21313721, at *5 (E.D.N.Y. May 28, 2003) (finding that, for purposes of *Buie,* a hotel room bathroom was immediately adjoining the hotel room because an attack could be launched from there). This results from the fact that arrests pursuant to a warrant are typically conducted in people's homes, which usually have far smaller and more confined spaces. In such cases, the area from which an attack may be launched is in an adjacent closet or behind a large piece of furniture. In this case, however, the agents were executing a search warrant in a fairly large warehouse, which was not cleanly subdivided by walls or other immovable barriers capable of preventing an attack. There is no question that from the time the agents entered the warehouse until the time that the agents had identified precisely who Richard Teng was, the agents were highly susceptible to an attack from any of the aisles of boxes that ran along the sides of the main corridor. Because these aisles were not separated from the agents' position by any walls or other immovable barriers, they were "spaces immediately adjoining the place of arrest from which an attack could be immediately launched" within the meaning of *Buie.*

The facts here are clearly distinguishable from those that led to the full reasonable suspicion-requiring "security sweep" in *Buie.* In that case, police officers had already arrested the suspect for whom they had an arrest warrant. One officer went into the basement (in which the arrested suspect had been hiding before he was arrested) in order to determine that no one was there who could harm the officers. A confederate of the arrested suspect could not have "immediately launched" an attack on the agents from the basement. Here, the areas Scartozzi "swept" were not cut off from the rest of the officers by a door and a flight of stairs, as the basement was in *Buie.* Had a confederate of Danny Teng been hiding behind one of the rows of boxes, he could have very easily surprised the agents and harmed them.

Further, the quick visual sweep conducted by Special Agent Scartozzi between the time that the agents entered the warehouse and until the determination of Richard Teng's identity was of the limited form of search permitted under *Buie.* Once properly inside, the agents were entitled, for their own safety, to make a quick, visual sweep of areas from which an attack on them could have been launched. Special Agent Scartozzi did just this on May 6, 2003—he did not touch any items in the warehouse, instead performing only a quick "visual sweep" in order to determine that no one else was hiding behind the rows of boxes. Tr. at 127–130. This

sweep took only five to seven minutes to sweep a space that was approximately 6,000 to 10,000 square feet. *Id.* at 144.

> As Judge Patterson recently explained, The court takes judicial notice that policemen are very frequently put in grave personal danger and, consequently, take precautionary measures that to a laymen may seem unnecessary but laymen have not been exposed to the same dangers and, then, the Court cannot use their standards in judging the reasonableness of the policemen's actions. This is not a case where a reasonable police officer would conclude the premises were clearly secure and decide to do an evidentiary search in the guise of a protective search.

*United States v. Smith,* 2004 WL 574641, at *5 (S.D.N.Y. Mar.23, 2004). A finding that the very limited search such as that conducted by Special Agent Scartozzi conducted violated the defendants' Fourth Amendment rights would place law enforcement officers' lives at risk.

Even if this court were to find that Special Agent Scartozzi's initial sweep of the warehouse did cover a space that was outside of the area immediately adjacent to the place of arrest, beyond the area from which an attack could be immediately launched, this court would still hold that Scartozzi's initial sweep of the warehouse was consistent with the Fourth Amendment and *Buie.* In *Buie,* the Court held that when searching spaces outside of the "spaces immediately adjoining the place of arrest form which an attack could be immediately launched .... there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093. Reasonable suspicion must be supported by "specific and articulable facts" and "reasonable inferences from those facts." *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In this case, Scartozzi possessed sufficient information to justify a security sweep of the entire warehouse. First, Scartozzi believed that a fugitive was present in the warehouse. Donovan believed the fugitive was wanted for bail jumping. Tr. at 165. While the agents had no specific knowledge that Danny Teng was dangerous, Agent Donovan stated that arresting any fugitive can be dangerous and, as a matter of practice, federal law enforcement officers take precautions, such as ensuring a substantial number of agents are present before attempting to execute a fugitive arrest warrant.

Second, from essentially the moment the agents entered the warehouse to execute the arrest warrant, the agents observed in plain view large amounts of baggies, glass vials, and glass pipes. Given the massive amounts of "paraphernalia" present throughout the warehouse, I find that Special Agent Scartozzi observed the drug paraphernalia while conducting the visual scan in the main corridor, prior to the time at which Scartozzi actually initiated the protective sweep. Possession of this "drug paraphernalia" violates New York State Penal Law § 220.50. Drug paraphernalia is prohibited precisely because of its close association with narcotics trafficking. Once the agents became aware that they were in a warehouse that contained massive amounts of prohibited drug paraphernalia, there was reason to believe that third persons who may cause harm to the agents were present in the warehouse. Specifically, they had reason to believe that: (1) there were individuals working in the warehouse who had a strong incentive to use whatever means necessary—including violence—to avoid being apprehended; and (2) individuals involved in narcotics trafficking—which is, by its very nature

dangerous—could be present in the warehouse for the purpose of purchasing drug paraphernalia. When these two potential risks are coupled with the fact that the agents believed a fugitive was present in the warehouse, it is clear that the agents possessed the reasonable articulable suspicion required under *Buie* to conduct a protective security sweep.

Further, the layout of the warehouse made a protective sweep particularly appropriate. Scartozzi saw immediately upon entering the warehouse, a building he had never entered before, that inside were long, high rows of stacks of boxes. *Cf. Buie,* 494 U.S. at 333, 110 S.Ct. 1093 ("Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'home turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings"). These rows would have given a fugitive or confederates excellent places to hide.

### D. The Admissible Evidence Is Limited

The plain view exception to the Fourth Amendment clearly applies in this case: (1) Special Agent Scartozzi was lawfully present when he conducted a protective sweep pursuant to *Buie,* and (2) there was probable cause to believe that the "drug paraphernalia" seen was evidence of criminal conduct under *United States v. Main Street Distrib., Inc.,* 700 F.Supp. 655, 659 (E.D.N.Y.1988) (holding that even though containers were not contraband [under an earlier drug paraphernalia statute], a 'totality of the circumstances' test for determining probable cause could include consideration of such containers). *See Horton,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (holding that the Fourth Amendment permits seizure of property in plain view where (1) the officer has a lawful right to access the object itself and (2) the property's incriminating character is "immediately apparent"). The plain view exception only applies, however, to the specific objects that Special Agent Scartozzi saw during his protective sweep. In other words, while the specific individual baggies that Special Agent Scartozzi witnessed in plain view are admissible, other baggies that are similar or identical to those that were in plain view are not admissible. With the exception of the crack pipes at the warehouse, all of which according to the record appeared to be in plain view, it is not clear whether the Government can show, by a preponderance of the evidence, which specific pieces of drug paraphernalia were in plain view, since so many of the items looked alike. The Government shall advise the court within ten (10) days as to which specific items it proposes to admit and how it proposes to establish by a preponderance of the evidence that they are admissible (affidavits, a hearing, etc.). The defendants shall respond within five (5) days.

Finally, because the plain view exception applies, Special Agent Scartozzi may testify at trial as to what he observed while conducting his protective sweep, even though some of the objects that Special Agent Scartozzi observed may not be admissible themselves.

## III. CONCLUSION

For the reasons discussed above, the Government's motion for reconsideration is granted in part. The court will review the parties' submissions, and the court shall determine how to proceed.

SO ORDERED.