UNITED STATES of America, Plaintiff,

v.

Noah ROBINSON, Defendant.

No. 89 CR 0908–31.

United States District Court,
N.D. Illinois, E.D.

May 20, 1991.

William R. Hogan, Jr., John F. Hartmann and Ross Silverman, for plaintiff.

Robert Simone and Anita Rivkin–Carothers, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On May 15, 1991, we conducted a supplemental evidentiary hearing on defendant Noah Robinson's motion to suppress. Based upon the evidence educed at this hearing and a review of other pertinent filings,[1] we find that Holandus "Jake" Oliver was controlled and arrested at the mouth of the interior hallway connecting the pool room with several other rooms at 10910 South Michigan Avenue. We further find that the arresting law enforcement officers' protective sweep of Robinson's locked bedroom was permissible, given that the bedroom was a space "immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990). Accordingly, we sustain the government's objections to Magistrate Judge Bernard Weisberg's Further Report and Recommendation, filed May 2, 1991, adopt the Further Report to the extent that it is consistent with the findings outlined above and the ultimate conclusions we enumerate below, and deny Robinson's motion to suppress.

As factual background, it appears that four law enforcement officers were assigned to surveillance of the converted storefront apartment building at 10910 South Michigan Avenue on June 4, 1988. At some point, their superiors directed them to arrest Jake Oliver, who lived in the

---

1. We have reviewed *de novo* Magistrate Judge Weisberg's initial Report, the government's motion for reconsideration, Magistrate Judge Weisberg's denial of reconsideration, the government's objections to the initial Report, our own analysis in remanding the motion to suppress for an evidentiary hearing, Magistrate Judge Weisberg's Further Report and Recommendation, the transcript of proceedings before the Magistrate Judge April 26–27, 1991, and the government's objections to the Further Report.

building. In the course of effecting the arrest, or very shortly thereafter, the officers broke into defendant Robinson's locked bedroom, where they saw in plain view certain potentially probative pieces of evidence. They returned the following day with a search warrant and seized the evidence.

The permissibility of the officers' initial entry into Robinson's bedroom turns on the applicability of the protective sweep doctrine as explained by the Supreme Court in *Buie*. In that case, the Court held that "as an incident to ... arrest," law enforcement officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 110 S.Ct. at 1098. The Court also postulated a scenario "[b]eyond" a purely precautionary sweep where "reasonably prudent" law enforcement officers have "articulable facts which, taken together with the rational inferences from those facts," would warrant a belief "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

As procedural background, we set forth the chronology of events predating our May 15 evidentiary hearing. On February 15, 1991, Magistrate Judge Weisberg filed an initial Report and Recommendation on Robinson's motion to suppress evidence. On April 2, 1991, Magistrate Judge Weisberg denied the government's motion for reconsideration. On April 22, 1991, we directed the magistrate judge to conduct an evidentiary hearing in order, *inter alia*, to better determine whether Robinson's bedroom was a place "immediately adjoining" the arrest site, thereby legitimizing the subsequent protective sweep. *See Buie*, 110 S.Ct. at 1098. We determined that an evidentiary hearing might provide additional evidence that would have been helpful to

Magistrate Judge Weisberg as he formulated his initial Report and Recommendation; for whatever reason, the government prior to that initial Report had elected to present only the "probable cause" affidavit of one of the officers [2] and the transcript of similar suppression motion proceedings before a South Carolina state judge.

With a firm trial date of May 6, 1991 looming ominously, Magistrate Judge Weisberg conscientiously and expeditiously conducted an evidentiary hearing and heard oral argument Friday and Saturday, April 26–27, 1991. His Further Report and Recommendation, dated May 2, 1991, again urged that we grant Robinson's motion to suppress. Magistrate Judge Weisberg's excellent Further Report depended heavily on his inability to "completely credit the testimony of any of the witnesses"; indeed, the magistrate judge wrote that "[b]ecause the court believes that none of the witnesses told the whole truth, the court cannot simply choose to believe one person's testimony or another's. This recommended decision is based on the probabilities that events did or did not happen as described, without attempting to resolve each conflict in the testimony...." Further Report and Recommendation at 4. Importantly, however, Magistrate Judge Weisberg found that "[a]fter hearing the testimony and examining the photographs admitted as exhibits, we now are persuaded that, *assuming* [Oliver] was arrested in the pool room, Robinson's bedroom was a space 'immediately adjoining the place of arrest from which an attack could be immediately launched.'" *Id.* at 6 (emphasis in original) (quoting *Buie*, 110 S.Ct. at 1098). Magistrate Judge Weisberg ultimately did find that "Oliver was arrested or, in police parlance, 'controlled,' in the vestibule and then taken into the pool room." *Id.* at 8. The government filed its objections to the Fur-

---

**2.** The officers did not immediately seize the evidence they found in Robinson's bedroom, though (as the government pointed out in the hearing before us) the items in question apparently were in "plain view." *See* Robinson Exhibits 6–14 (photographs of interior of Robin-

son's bedroom). The affidavit considered initially by Magistrate Judge Weisberg had been developed by one of the arresting officers pursuant to requesting a search warrant from Magistrate Judge W. Thomas Rosemond, Jr.

ther Report on Friday, May 3, 1991.[3]

Our decision to conduct a separate, independent evidentiary hearing was prompted by the magistrate judge's inability to fully credit (or discredit) particular testimony and his resulting need to rely on what he perceived as the "probabilities" of what happened on June 4, 1988. The four officers' testimony that they controlled and arrested Oliver at the interior doorway makes *Buie* applicable; Oliver's testimony, on the other hand, that the officers controlled him with a gun to his head just inside the exterior door, several feet from Robinson's bedroom, renders *Buie* inapplicable, absent articulable facts under the second part of the *Buie* test. We decided to conduct an evidentiary hearing in hopes of being able to hear firsthand the testimony of the officers and Oliver in order to make a determination as to which version of events should be credited.[4]

We focused our hearing on the narrow issue of where inside the building at 10910 South Michigan Avenue Jake Oliver was controlled and arrested. The government offered as witnesses Sergeant David O'Callaghan, Sergeant Daniel Brannigan, and Detective James Fitzmaurice of the Chicago Police Department, and Special Agent Thomas O'Brien of the Bureau of Alcohol, Tobacco and Firearms. All four officers were part of the Organized Crime Drug Enforcement Task Force, and they were the arresting officers on June 4, 1988. We did not hear any testimony from Jake Oliver, however, because Robinson chose not to call him as a witness after Oliver's attorney informed us in open court that Oliver would invoke his Fifth Amendment privilege against self-incrimination if called.

After hearing and evaluating the testimony of the four officers, we find that Jake Oliver was controlled and arrested at the mouth of the interior doorway leading from the pool room into the hall. The officers uniformly and credibly testified at the May 15 hearing that Oliver opened the outer door to the building and "backpeddled" several steps into the pool room. That certain details of an arrest which transpired almost three years ago were inconsistently recalled by the officers—for example, which officer actually handcuffed Oliver, and at what precise moment Oliver identified himself—does not impugn their credibility; indeed, it suggests that the officers did not rehearse and tailor their testimonies to be absolutely consistent.

On the central issues, the officers' version credibly jibed. Oliver opened the door, backpeddled away as the officers approached, and was controlled at the interior doorway after he had taken 3–5 steps backwards. Government Exhibit Robinson 4, a photograph of the pool room depicting the distance from the vestibule to the interior doorway, corroborates the officers' accounts of the arrest; even a person of Oliver's height, recalled by Special Agent

---

**3.** On Monday, May 6, 1991, minutes before the start of jury selection, we asked the government if it would agree to waive its pretrial right of appeal to enable us to conduct our own evidentiary hearing on the motion to suppress after the jury was selected and empaneled (thereby causing double jeopardy to attach). The government had no objection to this proposal, and agreed to waive its right to appeal.

**4.** On May 6, 1991, again shortly before the start of jury selection, we explained our position on the government's objections to the Further Report:

My own view is that I want to have a hearing to—a very limited hearing—determine the credibility of Mr. Oliver and the police officers on where Mr. Oliver was arrested, whether control of him was taken in the vestibule or further down, as Magistrate Weisberg I think really avoids a credibility determina-

tion, as I read his opinion. He simply says that he's not sure he can believe either group and inferentially makes a factual determination. I don't think that's enough. I think that based upon that, I have to take a look at it and see whether I can make a credibility determination, and I intend to do that.... The only thing that I'm concerned about is the one glitch, as I see it, in the record before the magistrate where he says "I'm not going to make a credibility determination—I can't believe anybody." I just don't think—that may be the ultimate decision, I don't know whether it will or won't be—but I don't think I can accept that on review. Since I have the authority to conduct an evidentiary hearing *de novo* myself on that issue, I don't think I can accept that from the magistrate at this point. *In camera* proceedings, May 6, 1991 (transcribed from tape recording of proceedings).

O'Brien as close to his own, or about 5'8", would have no physical difficulty backpeddling slightly more than the length of the couch that was on the south wall of the pool room between the vestibule and the interior doorway. Sergeant Brannigan, for his part, credibly testified that when he came inside, about twenty or so seconds after Oliver initially opened the door, his colleagues had Oliver controlled against the wall immediately adjacent to the interior doorway.

At the close of the May 15 hearing, Robinson's attorney argued that, under *Buie*, the location of Oliver's arrest did not matter as much as the fact that the protective sweep was conducted *after* the arrest had been effectuated. In fact, counsel noted, *Buie* itself would seem to be limited on its face: "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 110 S.Ct. at 1099.

The Court's apparent limitation, however, is not as clear as Robinson might hope. *Buie* speaks to two different protective sweep circumstances. The first circumstance is a purely precautionary sweep dictated by the geography of the arrest location. Here, officers may, "as a precautionary matter and without probable cause *or reasonable suspicion,* look in ... spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 1098 (emphasis added). The second circumstance contemplates a

sweep beyond the immediately adjoining spaces when officers have articulable facts and rational inferences that danger lurks in the area to be swept. A literal interpretation of Robinson's argument would mean that we would be put in the position of limiting the purely precautionary sweep— the type of sweep that may be conducted "without ... reasonable suspicion"—to a period of time "necessary to dispel the reasonable suspicion of danger." That cannot be what the Supreme Court had in mind. The first part of the limitation cited by Robinson applies primarily or entirely to *Buie*'s second kind of protective sweep— those sweeps *not* purely precautionary in nature and for which a "reasonably prudent officer" must have "articulable facts" and "rational inferences" therefrom sufficient to warrant a belief that "the area to be swept harbors an individual posing a danger to those on the arrest scene." [5]

We also believe that the government's interpretation of the second part of the "limitation" language in *Buie* makes more sense than Robinson's. The officers' testimony (particularly Brannigan and O'Callaghan's) was that they undertook the sweep immediately after Oliver was placed under arrest. Although we decline to apply the "lasts no longer than is necessary to dispel the reasonable suspicion of danger" language to a purely precautionary sweep, we do find the remainder of that line in *Buie*—"and in any event no longer than it takes to complete the arrest and depart the premises"—applicable to such sweeps. Law enforcement officers, however, are not required when making an arrest inside

---

**5.** The Supreme Court sets forth the two protective sweep circumstances in the last textual paragraph on page 1098. *Buie*, 110 S.Ct. at 1098. In a new paragraph beginning page 1099, the Court explains what we believe Robinson's counsel correctly identifies as a limitation. *Id.* at 1099. In full, that paragraph reads:

We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is *nevertheless not a full search of the premises,* but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Id.* (footnote omitted).

The fact that the "limitation" language is in its own paragraph and not in the paragraph in which the Court sets out the two sweep circumstances might suggest that the limitation applies to both circumstances. Paragraph structure aside, however, we cannot reconcile Robinson's argument with what we read as the Court's clear holding that pursuant to a purely precautionary sweep law enforcement officers may search certain areas "without probable cause or reasonable suspicion." In essence, we agree with Robinson that the Court is limiting protective sweeps in the first paragraph of page 1099, but we believe that such limitation is not applicable to the purely precautionary kind of sweep in the manner that he suggests.

a building to surreptitiously back out of that building, guns drawn and pointed in all directions. Having made the arrest of Oliver inside the building at 10910 South Michigan Avenue, the officers were entitled, under *Buie*, to conduct a protective sweep to ensure their safety and that of the arrestee. Surely the arrest would not be considered "complete," *id.*, if the arresting officers were gunned down by persons concealed in "closets [or] other spaces immediately adjoining the place of arrest," *id.* at 1098. Moreover, the fact that the officers did not leave the building immediately and instead talked to Oliver at some length does not invalidate the sweep. There is no evidence to suggest that the sweep was conducted at any time other than immediately after Oliver had been controlled at the interior doorway. The fact that the officers did not "depart the premises" is really irrelevant for *Buie* purposes, since there is no claim that they arrested and controlled Oliver and then some hours (or even minutes) later conducted a sweep.

Finally, Robinson argued at the May 15 hearing that a protective sweep of his bedroom was unnecessary because Detective Fitzmaurice, gun drawn, had the door covered. This position is simply inconsistent with *Buie*. Officers engaged in a purely precautionary sweep are entitled to actively "look in closets and other spaces immediately adjoining the place of arrest" even "without probable cause or reasonable suspicion." *Id.* They need not rely on "passive" or "defensive" tactics to ensure the safety of themselves and the arrestee.

Robinson's motion to suppress is denied for the foregoing reasons. It is so ordered.[6]

---

**6.** Magistrate Judge Weisberg's Further Report contains three typographical errors (certainly understandable given the expedited nature of the Further Report) that we hereby ask him to correct. On page 6, line 4, the Further Report should read *"assuming* Oliver," not *"assuming* Robinson." Oliver should replace Robinson on page 9, line 13. Finally, the date at page 3, line 24, should be April 22, 1991.