2025 IL App (1st) 240412-U

FIRST DIVISION
October 27, 2025

No. 1-24-0412

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 22 CR 04440 |
| DESHAWN MATTHEWS, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Neera Lall Walsh, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:    Defense counsel's decision not to file a motion to suppress did not render counsel's representation constitutionally deficient where such a motion would have been meritless. The record establishes that any error in the circuit court's preliminary *Krankel* inquiry into the defendants' *pro se* allegations of ineffective assistance of counsel was harmless. The armed habitual criminal statute under which the defendant was convicted (720 ILCS 5/24-1.7 (West 2020)) is constitutional both on its face and as-applied to the defendant.

¶ 2    After a bench trial in the circuit court of Cook County, the defendant, DeShawn Matthews,

was found guilty of being an armed habitual criminal (720 ILCS 5/24-1.7 (West 2020)) and sentenced to eight years' imprisonment. On appeal, the defendant argues that his trial counsel was ineffective because he failed to raise a meritorious motion to suppress evidence of his possession of a firearm, which formed the basis for his conviction. The defendant also argues that he is entitled to a new hearing on his *pro se* posttrial motion alleging ineffective assistance of counsel because the State improperly took on an adversarial role at the preliminary inquiry stage of his *Krankel* proceedings (see *People v. Krankel*, 102 Ill. 2d 181 (1984)), and the circuit court erred in finding no possible neglect of his case. Finally, the defendant asserts that the armed habitual criminal statute (720 ILCS 5/24-1.7 (West 2020)) under which he was convicted is unconstitutional, both facially and as applied to him, as it violates the second amendment (U.S. Const., amend II). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On April 25, 2022, the defendant was charged in a three-count indictment with unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)), unlawful possession of a firearm with a defaced serial number (720 ILCS 5/24-5(b) (West 2020)), and being an armed habitual criminal (720 ILCS 5/24-1.7 (West 2020)), after a rifle was discovered inside an apartment in which he was arrested for an unrelated crime.

¶ 5       The defendant proceeded with a bench trial at which the following relevant evidence was adduced. The State presented the testimony of three law enforcement officers involved in the defendant's arrest: Will County Sheriff's Deputy Steve Ardent, Will County Sheriff's Sergeant Paul Rojek, and Chicago Police Officer Enrique Garcia. According to their testimonies, at about 6 a.m., on March 22, 2022, members of an arrest warrant execution team, led by Deputy Ardent, proceeded to 7803 South Essex Avenue, to locate the defendant, who had an outstanding arrest

warrant for criminal sexual assault from Will County. According to Deputy Ardent, the police believed that the defendant would be in apartment 3 at this address because the "Clear database" listed it as his primary residence.

¶ 6    Once at the address, the team, which included about 12 officers, set up a perimeter around the building. Officer Ardent described the building as a large structure with multiple entrances and an unknown number of occupants. Deputy Ardent and Sergeant Rojek were stationed with the group covering the front entrance. For about two hours, the officers conducted surveillance outside of the building. Neither could recall seeing anyone entering or leaving during that time. Neither knew whether the defendant was in apartment 3, or how many people lived there or were on the premises that day. In addition, neither knew whether anyone had come and gone from apartment 3 and into another apartment inside the building in those two hours.

¶ 7    At approximately 8 a.m., together with other officers, Deputy Ardent, Sergeant Rojek and Officer Garcia entered the building from the front. Because Officer Garcia was there in a support role, representing the Chicago Police Department, he waited on the internal stairway while the other team members executed the arrest warrant. Deputy Ardent and Sergeant Rojek proceeded to the third floor, knocked on the front door of apartment 3, announced their presence and stated that they were looking for the defendant. As they did so, officers from the group guarding the building's rear entrance notified them that an individual had opened the rear door and, having observed their presence, quickly reentered the apartment. Sergeant Rojek testified that this individual was described as a "black male," while Deputy Ardent averred that the description was of a "male black match[ing] our target's descriptors." A few seconds later, and about 30 to 60 seconds after the officers had knocked on the front door of the apartment, the defendant opened that door,

wearing only his boxer shorts.

¶ 8    The defendant was taken into custody after which Sergeant Rojek stood next to him in the living room, while other officers, including Deputy Ardent, conducted a protective sweep of the residence. Officer Garcia remained on the stairwell below the apartment and could not observe the events from there.

¶ 9    Deputy Ardent testified that during the protective sweep, the officers systematically cleared the residence to make sure there were no threats there. They went room to room through the apartment, which included a living room, kitchen, hallway, and two bedrooms, and encountered no one else inside. In the southwest bedroom, they discovered, in plain view, a three-foot, black, Smith & Wesson rifle on top of an air mattress.

¶ 10    After the completion of the protective sweep, Officer Garcia, who had remained in the building stairwell, was called inside to recover and secure the rifle. As he climbed upstairs, he observed members of the Will County Sheriff's Office with the defendant detained on the landing outside of apartment 3. Once inside, Officer Garcia recovered the rifle and noticed that its serial number was scraped off. Deputy Ardent acknowledged that the rifle was neither fingerprinted nor DNA tested.

¶ 11    Sergeant Rojek testified that when it was time to transport the defendant to the police station, he went to find the defendant some clothes. On the floor of the southwest bedroom, about five to six feet from the air mattress where the rifle was discovered in plain view, Sergeant Rojek found a pair of unfolded jeans, with a belt, which looked like someone had just worn them and taken them off. According to Sergeant Rojek, the defendant denied that the jeans were his. After going through the jeans, however, the sergeant found an Illinois driver's license with the defendant's name and photograph in one of the pockets. While the sergeant could not recall

whether the Essex address was listed on the defendant's driver's license, he testified that, as he helped the defendant put on the jeans, "they appeared to fit him." In addition, Officer Garcia retrieved a shirt from the southwest bedroom closet, which, while standard size, also fit the defendant.

¶ 12     During the protective sweep, inside the kitchen, Officer Burroughs discovered a vehicle seizure notice, which was addressed to the defendant at the Essex address. None of the officers at trial could state how long the seizure notice had been there.

¶ 13     After the testimony of the three officers, the State introduced into evidence two exhibits: (1) a photograph of the recovered rifle; and (2) video footage from Officer Garcia's body worn camera, depicting the layout of the apartment. That footage reveals the apartment to be small, with a foyer that opens onto two areas, the living room on one side, and a very narrow galley kitchen, on the other. The confined galley space itself connects two small bedrooms and a bathroom by way of an open alcove.

¶ 14     At trial, the parties stipulated that the defendant had two prior felony convictions for aggravated discharge of a firearm and residential burglary. The defendant offered no evidence in his defense.

¶ 15     In closing, defense counsel argued that the State had failed to prove beyond a reasonable doubt that the defendant possessed the rifle, which was the predicate element necessary to establish that he was an armed habitual criminal. Defense counsel asserted that the rifle was never seen on the defendant's person, or in his immediate vicinity and that no physical evidence connected him to the weapon. In addition, defense counsel pointed out that during their two-hour surveillance, the police could not know whether someone moved between the various apartments inside the building, such that it was possible that someone else left the weapon inside the apartment.

According to counsel, it was illogical to think that the defendant knew about the weapon but did not try to hide it before he let the police inside the apartment, and that it made more sense to conclude that the gun belonged to someone else and that the defendant left it on the air mattress without touching it.

¶ 16    After hearing closing arguments, the circuit court found the defendant guilty of being an armed habitual criminal. The court found that the State proved beyond a reasonable doubt that the defendant constructively possessed the weapon because, among other things, the defendant's driver's license was inside the pocket of the jeans that were recovered from the same bedroom as the rifle. The court also found relevant that both the pants and the shirt, recovered from that same bedroom, fit the defendant. In doing so, the court took judicial notice of the fact that the defendant was of "slight built" (estimating him to be between about 5' and 5' 2" tall and to weigh 110 to 115 pounds).

¶ 17    At the following court hearing, the defendant informed the court that he wished to "make a claim for ineffective assistance of counsel." The court acknowledged the defendant's request and informed him that he could present his claim on the next court date. The court then asked the defendant if he wanted to represent himself and the defendant indicated that he did.

¶ 18    The defendant subsequently filed a *pro se* motion for a new trial, alleging: (1) ineffective assistance of trial counsel for counsel's failure to file a motion to suppress the rifle and to call his mother to testify; (2) the evidence was insufficient to prove that he was guilty of being an armed habitual criminal; (3) the search of the apartment was unconstitutional under the fourth amendment (U.S. Const, amend IV); and (5) his "charges violated [his] second amendment right." (U.S. Const., amend II).

¶ 19    On January 17, 2024, the circuit court conducted what it described as "a pre-*Krankel*

hearing." The court first informed the defendant that by proceeding *pro se* on his motion for ineffective assistance of counsel he would be waiving any attorney-client privilege, such that the "State could choose to call [his] attorney who's then going to talk about representing you." The defendant indicated that he understood and wanted to proceed with his motion. Asked by the court to elaborate on his written allegations, the defendant then argued:

"Defense counsel, he was ineffective for not filing a motion to suppress evidence. The day that I was arrested, the police officers, they executed an arrest warrant for me at the 7803 Essex Avenue address.

They knocked on the door, I answered the door, and I was arrested and placed into custody without incident.

After I was arrested, they ran to the back of the apartment[,] and they found a gun in one of the back bedrooms. But, your Honor, this room shouldn't have been swept because it wasn't immediately adjoining my place of arrest, which was the front door. So[,] it's the front door and then next to the front door is a living room, and next to the living room is a kitchen and it's a divider space between the kitchen and living room. Next to the kitchen it's a hallway, it's a divided space between the kitchen and the hallway, and then immediately adjoining that hallway is two bedrooms, and the gun was found in one of those bedrooms in the back.

Judge, the police officer[s], they had no information that there was a third party present. I was already placed into custody, so my dangerousness was irrelevant.

And, second, your Honor, defense counsel was ineffective for not investigating my mother and calling her to the stand as a witness to testify. If she would have testified, she would have testified that I did not live at the 7803 Essex Avenue address. That her, her

boyfriend, and my youngest brother lived at the 7803 Essex Avenue address, and she would also testify that I only visited from time to time.

Your Honor, I don't believe that it was a matter of trial strategy for defense counsel not [to] fil[e] the motion because I never testified at trial, and the evidence that the State had against me was just overwhelming."

¶ 20    After speaking with the defendant to confirm his arguments, the court asked the State for a response. The State noted that defense counsel "had other clients," and that "in speaking with him," it was unclear whether he would be available to testify that day, such that the matter could be "commenced and continued" for his appearance. The State then asked whether the court was going "to require [it] to make legal arguments," because under those circumstances defense counsel's testimony might be irrelevant. The court replied, "It depends on what you want to respond with." The State then argued that because the defendant had failed to make a *prima facie* showing of ineffective assistance, defense counsel's testimony was unnecessary. The State asserted that counsel's decision not to file a motion to suppress the rifle was strategic because the motion would have proven frivolous. According to the State, the rifle was legally obtained because it was found in plain sight during a protective sweep of the apartment. In addition, the search for the defendant's clothing would have inevitably led to its discovery. The State also asserted that the decision whether to call a witness, who was not present during the arrest and subsequent search, was a matter of trial strategy. The State, therefore, asked the court to deny the defendant's *pro se* motion alleging ineffective assistance of counsel.

¶ 21    After reviewing the defendant's *pro se* motion and its own trial notes, the circuit court held that the defendant's claims of ineffective assistance of counsel did not warrant the appointment of new counsel to represent him at a *Krankel* hearing. The court held, *inter alia*, that upon defendant's

arrest, the police searched the apartment to ensure that no one else was present and found the rifle in plain sight. The court also found that the rifle was an "inevitable finding at that point because they're not going to take you out in your boxer shorts." In addition, the court found that the defendant's mother was not present during the search and therefore could not "talk about what was happening at the time."

¶ 22    After denying the remainder of the defendant's *pro se* motion for a new trial, the circuit court inquired whether the defendant wished to be represented by his defense counsel at the sentencing hearing. The defendant responded in the affirmative. At the sentencing hearing, the parties presented evidence in aggravation and mitigation, and the defendant made a statement in allocution. The circuit court sentenced the defendant to eight years' imprisonment on the armed habitual criminal count, merging the two lesser offenses (unlawful possession of a weapon by a felon and unlawful possession of a firearm with a defaced serial number) into that conviction. The defendant now appeals.

¶ 23                                II. ANALYSIS

¶ 24    On appeal, the defendant makes three contentions. First, he asserts that his trial counsel was ineffective because he failed to file a meritorious motion to suppress the rifle recovered during his arrest. Second, the defendant contends that pursuant to *Krankel*, 102 Ill. 2d 181, he is entitled to a new hearing on his *pro se* posttrial ineffective assistance of counsel claim because: (1) the State impermissibly took on an adversarial role during the preliminary inquiry stage of that proceedings; and (2) the circuit court manifestly erred in finding no possible neglect of his case by counsel. Lastly, the defendant argues that the armed habitual criminal statute (720 ILCS 5/24-1.7 (West 2020)) is unconstitutional, both facially and as-applied to him, as it violates the

second amendment (U.S. Const., amend II). We address each contention in turn.

¶ 25                    A. Ineffective Assistance of Counsel

¶ 26    We begin with the defendant's argument regarding defense counsel's representation. It is axiomatic that every criminal defendant has a constitutional right to effective representation of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; see *People v. Moore*, 2020 IL 124538, ¶ 28. Claims of ineffective assistance are governed by the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *Moore*, 2020 IL 124538, ¶ 28; see also *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). Under *Strickland*, to succeed on an ineffective assistance of counsel claim, a defendant must establish both: (1) that his counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms; and (2) that he was prejudiced by counsel's conduct, *i.e.*, that but for counsel's deficient performance, there is a reasonable probability that the outcome of his proceedings would have been different. *Moore*, 2020 IL 124538, ¶ 29 (citing *Strickland*, 466 U.S. at 687-94)). The failure to establish either prong of *Strickland* will preclude a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 27    Where, as here, the ineffectiveness claim is premised on counsel's failure to file a motion to suppress, the defendant must overcome the strong presumption that counsel's decision not to file such a motion was a matter of trial strategy. *People v. Gayden*, 2020 IL 123505, ¶ 28 (the decision of whether to file a motion to suppress "is generally a matter of trial strategy, which is entitled to great deference" (Internal quotation marks omitted)). Moreover, to succeed on such a claim, the defendant must also demonstrate "that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Gayden*, 2020 IL 123505, ¶ 28 (citing *Henderson*, 2013 IL 114040, ¶

10

15).

¶ 28    In the present case, the defendant asserts that no trial strategy could have excused counsel's decision not to file a motion to suppress because, had the motion been successful, the suppression of the rifle would have forced the State to drop all charges against him. According to the defendant, the motion would have succeeded because the officers' sweep of the apartment, after he had already been detained on the landing, was impermissibly broad and therefore constituted an unconstitutional search.

¶ 29    The State responds that counsel's decision not to file a motion to suppress was strategic and that such a motion would have been meritless. The State argues that the police were justified in searching the entire apartment under the "protective sweep" exception to the warrant requirement, and that the defendant's lack of clothing was an exigency that gave the police legal justification, or at a minimum, a good faith basis, to search the apartment for clothing.

¶ 30    For the following reasons, we find that under the particular facts of this case, the police's "protective sweep" of the apartment was reasonable and justified, and that, therefore, counsel's decision to forego filing a motion to suppress did not rise to the level of ineffective assistance.

¶ 31    Unreasonable searches and seizures are prohibited under both the United States and the Illinois Constitutions. See U.S. Const., amend IV; see also Ill. Const. 1970, art. I § 6. "The chief evil against which the fourth amendment to the United States Constitution is directed is the physical entry of the home." *People v. Davis*, 398 Ill. App. 3d 940, 948 (2010); see also *People v. Absher*, 242 Ill. 2d 77, 83 (2011) (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)); *Silverman v. United States*, 365 U.S. 505, 511 (1961). To protect against the unjustified entry by law enforcement into the home, the fourth amendment has "drawn a firm line at the entrance to the house." *Payton*, 445 U.S. at 590; *Davis*, 398 Ill. App. 3d at 948. Thus, unless one of the enumerated

11

exceptions to the warrant requirement applies, an officer's warrantless entry into a home and any subsequent search and seizure inside are presumptively unreasonable. *Absher*, 242 Ill. 2d at 83. Because it is "well settled that arrest warrants are not search warrants," officers cannot enter and search a home even when they are conducting an arrest of a suspect pursuant to an arrest warrant based on probable cause. *United States v. Archibald*, 589 F. 3d 289, 295 (2009) (citing *Steagold v. United States*, 451 U.S. 204, 212-13 (1981)).

¶ 32    Nonetheless, the United State Supreme Court has identified two types of warrantless "protective sweeps" of a home that are constitutionally permissible immediately following a lawful arrest. *Maryland v. Buie*, 494 U.S. 325, 334-35 (1990). In *Buie*, 494 U.S. 325, 334-35 (1990), the police executed an arrest warrant in the defendant's house after he and his accomplice were suspected of armed robbery. *Id*. at 328. The police arrested the defendant after he emerged from the basement of his home. *Id*. A detective then entered the basement "in case there was someone else" down there. *Id*. The detective who searched the basement did not have information that anyone was actually in the basement but went down to secure the area anyway. *Id*. While checking the basement, the detective seized a red running suit that matched the description of a suit worn by one of the robbery suspects. *Id*. The United States Supreme Court held that the introduction of the red running suit at trial was permissible because the police seized it during a reasonable "protective sweep." *Id*. at 377.

¶ 33    The Court explained that "an in-home arrest puts the officer[s] at the disadvantage of being on [their] adversary's 'turf,' " and presents the danger of "[a]n ambush in a confined setting of unknown configuration." *Id*. at 333. Such an arrest also presents a significant risk of confrontation, because officers are taking the "serious step of taking a person into custody for the purpose of prosecuting him for a crime." *Id*.  Officers executing an arrest warrant therefore have a legitimate

interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id*.

¶ 34    The Court therefore held that there were two situations that justify a warrantless "protective sweep" of a residence. First, as "incident to the arrest[,] the officers c[an], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. Second, the officers may conduct a broader sweep beyond the areas "immediately adjoining" the place of arrest, so long as they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 334-35. The Court clarified that even this second type of protective sweep is "not a full search of the premises," but "extend[s] only to a cursory inspection of those spaces where a person may be found" and should last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 327, 335-36.

¶ 35    In the present case, the defendant contends that the search of the southwest bedroom was not justified under either type of protective sweep announced in *Buie*. The defendant asserts that the officers' search exceeded the first type of protective sweep because his arrest occurred on the landing, which is not "immediately adjacent" to the southwest bedroom where the rifle was found. The defendant also asserts that the record does not support a finding that the officers had reasonable suspicion to believe that the apartment harbored dangerous individuals so as to justify their broader

13

sweep of the apartment. For the following reasons, we disagree.

¶ 36    Whether or not a location is "immediately adjoining" the place of arrest for purposes of the first type of protective sweep announced in *Buie* "depends not on a static measurement but on the manner in which the space is configured." *United States v. Kirk Tang Yuk*, 885 F. 3d 57, 79 (2d Cir. 2018). Accordingly, physical distance alone is not dispositive in determining whether a space is "immediately adjoining." *United States v. Chevrin*, No. 10 Cr. 918 (RPP), 2011 WL 4373928, at *4 (S.D.N.Y. Sept. 20, 2011); see also *Kirk Tang Yuk*, 885 F. 3d at 79. Rather, the inquiry centers on whether the area searched is configured in such a way that "it 'immediately adjoin[s] the place of arrest' and *** constitutes a space *** 'from which an attack could be immediately launched[.]' " *United States v. Thomas*, 429 F. 3d 282, 287 (D.C. Cir. 2005) (quoting *Buie*, 494 U.S. at 334). In other words, it is the "safety of the officers, not the percentage of the home [or location] searched, [that] is the relevant criterion." *Thomas*, 249 F. 3d at 287.

¶ 37    Accordingly, where, as here, the search involves a small apartment, a protective sweep of a room or other space adjacent to the place of arrest will be permissible under the "immediately adjoining" exception, where "an attack could be immediately launched" from that location. *Id*.; see also *Buie*, 494 U.S. at 334.

¶ 38    In the present case, we find that because of the size and layout of the apartment, an attack on the officers could have been launched from any room in the apartment, such that the officers were justified in conducting a sweep of the entire residence under the first warrant exception announced in *Buie*. Footage from Officer Garcia's body worn camera, introduced at the defendant's trial, reveals the apartment to be remarkably compact. The foyer directly opens onto two areas: a modest living room, where the police held the defendant after they detained him, and a very narrow galley kitchen, which itself adjoins two small bedrooms and a bathroom by way of

an open alcove. As such, numerous corners and nooks are contained in a remarkably confined space. Given this layout, anyone hiding in the southwest bedroom could have launched a swift and surreptitious attack on the officers detaining the defendant in the living room, the foyer, or the landing outside of the apartment. As such, under the particular facts of this case, we find that the southwest bedroom was an "immediately adjoining" room to the place of arrest as contemplated by *Buie* and that the officers' protective sweep was, therefore, lawful. See *e.g.*, *Clark v. Webster*, 384 F. Supp. 2d 371, 382-83 (D. Me. 2005) (holding that under the first prong of *Buie*, based on the "modest size and layout of the condominium," in which the living room opened into the kitchen, and the closet, bathroom, bedroom, and laundry room were all connected to the living room by a short hallway, officers were justified in sweeping the entire premises); *United Sates v. Sinclair*, No. 10-CR-6211L, 2012 WL 5389729, at * 6 (W.D.N.Y. Nov. 2012) (explaining that "when officers execute an arrest warrant in a small apartment or premises, they generally will be entitled to perform a cursory sweep of the entire premises," and concluding that officers were "entitled to conduct a security sweep of the garage and adjoining office" under the first *Buie* prong, where the defendant was arrested "near the threshold between the office and the garage bay" and the "business premises consisted of two adjoining spaces—an open garage and an office—both of which were described as small"); *Thomas*, 429 F. 3d at 287 (holding that "[b]ecause the entrance to the bedroom was a straight shot down the hallway from the spot where [the defendant] was arrested the bedroom was a place 'immediately adjoining the place of arrest from which an attack could be immediately launched.' " (citation omitted)); *United States v. Lauter*, 57 F. 3d 212, 217 (2d Cir. 1995) (holding that "in light of the small size of the apartment," the back room of a two-room basement apartment "immediately adjoined" the first room where the defendant was arrested); *Kirk Tang Yuk*, 885 F. 3d at 79 (concluding that a bedroom "immediately adjoined" the

15

hallway where the defendant was arrested, even though the distance was "greater than the 'span of one room' "); *United States v. Big Apple Bag Co*., 317 F. Supp. 2d 181, 189-90 (E.D.N.Y. 2004) (holding that the sweep of an entire 6,000-10,000 square foot warehouse was permissible under the first prong of *Buie* because of the open nature of the warehouse space and the presence of rows of boxes behind which a person could have been hiding); *United States v. Robinson*, 775 F. Supp. 231, 234-35 (N. D. Ill. 1993) (holding that officers, who arrested the defendant at the mouth of an interior hallway of an apartment building connecting the pool room with several other rooms, conducted a reasonable protective sweep of the defendant's locked bedroom because the bedroom was a space "immediately adjoining" the place of arrest from which an attack could be immediately launched).

¶ 39    Contrary to the defendant's position, the officers were not required to immediately leave the building once the defendant was detained after opening the front door. "Law enforcement officers *** are not required when making an arrest inside a building to surreptitiously back out of that building, guns drawn and pointed in all directions." *Robinson*, 775 F. Supp. at 234-35. Having made the arrest of the defendant on the landing, under *Buie*, the officers were entitled "to conduct a protective sweep" of the apartment from which the defendant had emerged, "to ensure their safety and that of the arrestee." *Id*. at 235; "Surely the arrest would not be considered 'complete,' *** if the arresting officers were gunned down by persons concealed in 'closets [or] other spaces immediately adjoining the place of arrest." *Id*. at 235 (quoting *Buie*, 494 U.S. at 333); see also *People v. Free*, 94 Ill. 2d 378, 396-97 (1983) (recognizing the permissibility of a protective sweep achieved even without entry into a residence, as necessary to permit the police to "withdraw from the area with their prisoner without being fired upon"). Accordingly, under the particular facts of this case, the immediate detention of the defendant on the landing, while the police

conducted a protective sweep, does not invalidate their search.

¶ 40    What is more, even if the defendant's detention on the landing somehow precluded a finding that the southwest bedroom "immediately adjoined" the place of his arrest, for the following reasons, we conclude that the protective sweep was justified under the second *Buie* prong.

¶ 41    As noted above, *Buie* permits officers to conduct a broader sweep of a residence, beyond those spaces immediately adjacent to the place of arrest, where they possess "specific, articulable facts, which, taken together with the rational inferences from those facts would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. The inquiry is "an exceptionally fact-intensive one in which we must analyze a myriad [of] factors[.]" (*United States v. Starnes*, 741 F. 3d 804, 808 (7th Cir. 2013) (citing *United States v. Burrows*, 48 F. 3d 1011, 1016 (7th Cir. 1995)), These include, among other things: the configuration of the dwelling, the general surroundings incident to the arrest, the opportunities for ambush, the defendant's prior criminal history, the fact that officers are on the scene to take the defendant "into custody for purposes of prosecuting him for a crime," and the "disadvantage" the police are in by "being on [their] adversary's 'turf[.]' " *Buie*, 494 U.S. at 333; see also *Starnes*, 741 F. 3d at 808.

¶ 42    In the present case, contrary to the defendant's position, the officers did not conduct their protective sweep based on an "inchoate and unparticularized suspicion or hunch." *Buie*, 494 U.S. at 332. Instead, the record reveals that the officers had a reasonable, articulable suspicion of danger, justifying their search. The officers had reason to believe that the defendant was armed and dangerous. The defendant's outstanding arrest was for sexual assault, a forcible felony, and his prior criminal history included two felony convictions, one of which was for aggravated

17

discharge of a firearm. Moreover, when the officers knocked and announced their office, the defendant did not immediately answer the door. Instead, the officers were informed by the team covering the back entrance that a "black male" or a "male black who had the descriptors of the target," had attempted to exit the apartment but swiftly reentered it upon seeing them. Because the officers did not know how many people lived at or were present in the apartment that day, and the team in the back did not explicitly identify the defendant as the individual who had attempted to exit the apartment, the officers could reasonably conclude that someone, other than the defendant, was also present in the residence. Moreover, based on that individual's furtive conduct, the officers would also be justified in believing that this person had acted as a look-out, and might attempt to aid the defendant in escaping, thereby posing a danger to those on the arrest scene. Contrary to the defendant's position, this suspicion would not have been immediately assuaged once the defendant opened the front door unarmed. Instead, it would have been bolstered by the size and configuration of the apartment, which lent itself to numerous locations in which a person could hide and from which an attack could be directed. Accordingly, under the particular facts of this case, we conclude that the officers had a reasonable articulable suspicion of a danger, which justified their broader search of the apartment. See *e.g., Buie,* 494 U.S. at 334; *United States v. Alatorre*, 863 F. 3d 810, 814-15 (8th Cir. 2017) (holding that officers had an articulable fear of danger where the layout of the apartment allowed someone to hide out of view, the defendant had had a history of gun possession and violence, and there was a delay in answering the door, during which someone came and retreated); *People v. Hassan*, 253 Ill. App. 3d 558, 573-74 (1993) (holding that officers had a reasonable and articulable suspicion of a threat justifying a broader *Buie* sweep where the defendant had used a gun in the past and was without a gun when arrested, and someone was seen

at the front and back windows but the officers were uncertain whether it was the same person).

¶ 43 Because we find that the protective sweep of the southwest bedroom was constitutionally permissible under *Buie*, and the defendant does not contest that the rifle was found in plain view in that bedroom, we conclude that a motion to suppress would have been meritless. Accordingly, the defendant cannot establish that counsel's failure to file the motion to suppress rose to the level of constitutionally deficient performance. *Henderson*, 2013 IL 114040, ¶ 11 (failure to show a motion to suppress would have been meritorious will preclude a finding of ineffective assistance of counsel).

¶ 44                                  B. *Krankel* Hearing

¶ 45 Having disposed of this argument, we next turn to the defendant's grievances regarding the circuit court's inquiry into his *pro se* posttrial allegations of counsel's ineffectiveness. It is well-settled that such claims are governed by the common law procedure that has developed from our supreme court's decision in *Krankel*. *People v. Jackson*, 2020 IL 124112, ¶ 95. *Krankel* is triggered whenever a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. *People v. Jolly*, 2014 IL 117142, ¶ 29. After a defendant raises such a claim, the circuit court must employ a two-step procedure. *Jackson*, 2020 IL 124112, ¶ 97. First, the court must conduct a preliminary *Krankel* inquiry to "examine the factual basis of the defendant's claim." *People v. Roddis*, 2020 IL 124352, ¶ 35. If the court determines that the claim lacks merit or pertains only to matters of trial strategy, it need not appoint new counsel to represent the defendant and may deny the *pro se* motion. *Jackson*, 2020 IL 124112, ¶ 97. "A claim lacks merit if it is ' "conclusory, misleading, or legally immaterial" or do[es] "not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." ' " *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 71 (quoting *People v. Burks,* 343 Ill. App. 3d 765, 774 (2003) (quoting *People v. Johnson,* 159 Ill. 2d 97, 126

(1994)). However, if the court finds that the allegations demonstrate "possible neglect of the case" new counsel (*i.e.*, *Krankel* counsel) must be appointed to represent the defendant at an adversarial and evidentiary hearing on the defendant's claims. See *Jackson*, 2020 IL 124112, ¶ 97; *People v. Ayres*, 2017 IL 120071, ¶ 11; *Jolly*, 2014 IL 117142, ¶ 29. The appointment of new counsel avoids any conflict of interest that might arise if trial counsel was forced to justify his or her actions contrary to the defendant's position. *Jackson*, 2020 IL 124112, ¶ 97.

¶ 46    In the present case, the defendant takes issue with the manner in which the circuit court conducted the preliminary *Krankel* inquiry and the court's conclusion, after that inquiry, that the appointment of new counsel and an evidentiary hearing were unwarranted since the defendant's *pro se* allegations regarding defense counsel's representation lacked merit. The procedure to be followed at the preliminary *Krankel* inquiry "is somewhat flexible." *People v. Fields*, 2013 IL App (2d) 129045, ¶ 40. At this stage, the circuit court may consider both the factual basis for the claim and its legal merits. *Roddis*, 2020 IL 124352, ¶¶ 61, 70. The court may "inquire of trial counsel about the defendant's allegations" and "discuss the allegations with [the] defendant." *Ayres*, 2017 IL 120071, ¶ 12; see also *Jolly*, 2014 IL 117142, ¶ 30. The court may also " 'base its evaluation of the defendant's *pro se* allegations on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face.' " *Roddis*, 2020 IL 124352, ¶ 56 (quoting *People v. Moore*, 207 Ill. 2d 68, 79 (2003)); see also *Ayres*, 2017 IL 120071, ¶ 12; see also *Jolly*, 2014 IL 117142, ¶ 30. Nonetheless, the " 'inquiry should operate as a neutral and nonadversarial proceeding' " and the State's participation at this stage, if any, must be *de minimis. Jackson*, 2020 IL 124112, ¶ 112 (quoting *Jolly*, 2014 IL 117142, ¶ 38). This is so because when the State exceeds such participation, it biases the record against the *pro se* defendant and circumvents the creation of an objective record for review. *Id*. (quoting *Jolly*, 2014 IL 117142, ¶

39).

¶ 47    Whether the circuit court properly conducted a preliminary inquiry pursuant to *Krankel* is a legal question, which we review *de novo*. *Jackson*, 2020 IL 124112, ¶ 98. Where the circuit court properly conducts a preliminary inquiry and reaches a determination as to the merits of the defendant's ineffective assistance of counsel claim, however, its determination that a defendant has not demonstrated possible neglect of the case will be reversed only where that decision is manifestly erroneous. *Id*. Manifest error occurs when an error is "clearly evident, plain and indisputable." *Id*.

¶ 48    In the present case, the defendant first contends, and the State concedes, that the preliminary *Krankel* inquiry was improperly conducted because the circuit court allowed the State to take on an adversarial role and argue the merits of the defendant's two ineffective assistance of counsel claims, explicitly asking the court to deny the defendant's *pro se* motion. See *Jackson*, 2020 IL 124112, ¶ 114 (holding that where "the prosecutor presented argument in opposition to defendant's claim of ineffective assistance of counsel," complimented defense counsel's performance, and "actually asked the trial court to deny defendant's *Krankel* motion," the State's participation "consisted of more than a few passing remarks and was not *de minimis*"). The parties, however, dispute whether the State's participation rose to the level of harmless error requiring remand for the appointment of new counsel and a *Krankel* hearing. Our review is therefore *de novo*. *Id*.

¶ 49    Where the circuit court improperly permits the State to participate during the preliminary *Krankel* inquiry, to establish harmless error, "the State must prove beyond a reasonable doubt that the result would have been the same absent the error." *Jackson*, 2020 IL 124112, ¶ 127. In other words, "we determine whether the outcome would have been the same regardless of the error."

*People v. Stoecker*, 2019 IL App (3d) 160781, ¶ 11. We make this determination based on specific "facts of each case, considering the record as a whole." *Id*.; see also *People v. Dunn*, 326 Ill. App. 3d 281, 287 (2001).

¶ 50    In the present case, the defendant contends that the error cannot be harmless because the circuit court relied on the State's substantive arguments in denying his ineffective assistance of counsel claims. The defendant also asserts that we are without an objective and neutral record from the preliminary *Krankel* inquiry because the proceeding was tainted by the State's adversarial participation. We disagree.

¶ 51    At the outset, we find that contrary to the defendant's position, the State's participation in the inquiry did not prevent the circuit court from creating an objective record for us to review. The defendant was given a full opportunity to present his claims and make a factual proffer. He argued that counsel was deficient for failing to file a motion to suppress and detailed the layout of the apartment, asserting that a motion to suppress would have been meritorious because the police impermissibly conducted an expansive protective sweep that included the southwest bedroom leading to the recovered rifle. In addition, the defendant asserted that counsel should have called his mother to testify at trial because she would have explained that she lived in the apartment with her boyfriend and the defendant's younger brother, and that the defendant only occasionally visited. The State's response, while erroneously addressing the substance of both claims, was limited. The State did not introduce any evidence or cross-examine the defendant and did not otherwise create or misrepresent the record in anyway way. Instead, the State made legal arguments in response to the already existing objective record created by the defendant's proffer, merely arguing that both claims of ineffective assistance were challenges to counsel's strategic decisions and that a motion to suppress would have been meritless. Accordingly, we fail to see

how this error distorted the instant record or made it impossible for us, as a reviewing court, to consider whether the defendant was entitled to new counsel and a hearing on his ineffectiveness claims. See *Jackson*, 2020 IL 124112, ¶ 127 (holding that the error in allowing the State's adversarial participation in the preliminary *Krankel* inquiry did not prevent the trial court from creating an objective record for appellate review where the State "did not introduce evidence, cross-examine defendant or his trial counsel, or otherwise create, much less distort, the record in any way").

¶ 52    What is more, we find beyond a reasonable doubt that the circuit court would not have rendered a different conclusion regardless of the nature of the State's participation during the inquiry. In that respect, we find that the record unequivocally supports the conclusion that counsel did not neglect the defendant's case. See *Moore*, 207 Ill. 2d at 78 (During a preliminary inquiry, the circuit court must decide whether defendant's allegations demonstrate potential neglect by counsel). As we have already discussed above, because a motion to suppress would have been meritless under *Buie*, counsel's decision not to file such a motion was objectively reasonable, and the circuit court's finding that there was no possible neglect of the case based on this allegation was correct.

¶ 53    Turning to the defendant's second contention, we similarly find that the court properly concluded that counsel's decision not to call the defendant's mother to testify at the defendant's trial because she was not present during the defendant's arrest and subsequent search of the apartment did not rise to the level of potential neglect. The decision of whether to call a witness (and, in particular one, who by her very relationship with the defendant, would be less credible) is a matter of trial strategy, which can be rejected at the preliminary inquiry stage. *Jackson*, 2020 IL 124112, ¶ 106 (the decision "to call certain witnesses" is a "matter[] of trial strategy, generally

reserved to the discretion of trial counsel" such that where a defendant's *pro se* "allegations relate[] to trial strategy" they cannot serve as the basis of a *Krankel* claim"). Moreover, in the present case, testimony from the defendant's mother, as proffered by the defendant, that the defendant did not live in the apartment and only occasionally visited her there, would have had no impact on the defendant's constructive possession of the firearm. *People v. Givens*, 237 Ill. 2d 311, 338 (2010) ("[t]he law is clear that the exclusive dominion and control required to establish constructive possession is not diminished by evidence of others' access to the contraband."); *People v. Jones*, 2023 IL 128710, ¶ 30 (Constructive possession exists where the defendant has knowledge of the presence of the weapon and exercises immediate and exclusive control over the area in which it is found). The undisputed evidence at trial established that the defendant was arrested wearing only his boxer shorts, while a pair of jeans that fit him, and in whose pocket the police found his driver's license, was found crumpled on the ground, as if it had just been worn, next to the bed with the firearm. No one else was inside the apartment. Under these facts, because the testimony of the defendant's mother regarding how much time the defendant spent in the apartment could not have changed the outcome of his trial, the circuit court properly concluded that counsel's decision not to call her as a witness did not rise to the level of possible neglect.

¶ 54    Contrary to the defendant's position, the fact that defense counsel did not testify during the preliminary inquiry does not alter our conclusion. "[A] trial court is not *automatically* required to inquire of counsel during the preliminary phase of a *Krankel* hearing." *People v. Ieliot Jackson*, 2016 IL App (1st) 133741, ¶ 80 (citing *Moore,* 207 Ill. 2d at 77). Instead, as already noted above, the circuit court may " 'base its evaluation of the defendant's *pro se* allegations on its own knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face.' " *Roddis*, 2020 IL 124352, ¶ 56 (quoting *Moore*, 207 Ill. 2d at  79). Here,

the circuit court did just that. In rendering her decision, the trial judge explicitly stated that in addition to the defendant's *pro se* motion she had reviewed her own notes from the defendant's trial.

¶ 55    The defendant's reliance on *People v. Maya,* 2019 IL App (3d) 180275, ¶ 34, for the opposite conclusion is misplaced. In that case, the defendant filed a *pro se* motion for a new trial asserting that his trial counsel was ineffective for failing to move to exclude a biased juror. *Maya,* 2019 IL App (3d) 180275, ¶ 32. At the preliminary *Krankel* inquiry, the defendant told the court that he had informed defense counsel that one of the alternate jurors, who was ultimately seated on the jury, which found him guilty, was a correctional officer at the facility where the defendant was detained. *Id*. The defendant informed counsel that he had been in " 'several confrontations' " with this juror and that the juror had "told other inmates details of the defendant's case to induce those inmates to harass the defendant." *Id*. Even though defense counsel testified at the preliminary *Krankel* inquiry, the circuit court inexplicably "asked counsel no questions relating to the defendant's jury claim, and counsel did not otherwise offer any explanation." *Id*. ¶ 34.

¶ 56    In reversing for a new *Krankel* hearing, the appellate court held that the circuit court's finding that there was no possible neglect of the case was manifestly erroneous. *Id*. In doing so, the appellate court held that because the jury selection transcript confirmed that the juror worked as a correctional officer, and nothing in the record rebutted the defendant's "serious allegations" regarding his past interactions with this juror or his conversation with defense counsel, without counsel's testimony, the claims against counsel  stood "unrebutted." *Id*. ¶ 34. The appellate court observed that "[i]f the defendant's factual allegations [we]re true, the seating of [the correctional officer] on the jury that eventually found the defendant guilty shock[ed] the conscience." *Id*. ¶ 35. As the court concluded, because a "[t]rial before a biased jury is structural error and requires

automatic reversal," "[i]t [wa]s difficult to discern any potential strategy defense counsel might have for allowing a juror with demonstrated bias toward his client to serve on a jury." *Id*.

¶ 57 The defendant argues that, just as in *Maya*, in the present case, without any testimony from his defense counsel, his allegations regarding counsel's ineffectiveness for failing to call his mother as an "exculpatory" witness "remain unrebutted." We disagree.

¶ 58 Unlike in *Maya* where the defendant's claim raised a structural error, in the present case, the defendant's claim centers on counsel's decision not to call a witness at trial, an area where courts generally defer to trial strategy. *Jackson*, 2020 IL 124112, ¶ 106. Moreover, in contrast to the very specific and serious allegations by the defendant in *Maya*, some of which were corroborated by the jury selection transcript, in the present case, the defendant's allegations regarding counsel's failure to call his mother as an "exculpatory" witness are conclusory. Unlike the defendant in *Maya*, the defendant here never alleged that he spoke to counsel about his mother's testimony, nor that he told counsel what that testimony would entail. In fact, at the preliminary inquiry, the defendant also asserted that counsel failed to investigate his mother, an argument he now abandons for purposes of appeal in order to argue that counsel should have called this "exculpatory" witness. As such, unlike in *Maya*, in the present case, defense counsel's testimony was not needed to rebut the defendant's conclusory allegations, and the court could properly conclude that there was no possible neglect of the case based solely on the insufficiency of the defendant's own allegations. See *e.g.*, *People v. Chapman,* 194 Ill. 2d 186, 230-31 (2000) (holding that a *pro se* posttrial allegation that counsel failed to call an alibi witness was trial strategy and properly dismissed after a preliminary *Krankel* inquiry even where counsel was not asked to explain the reasons for that decision).

¶ 59 Accordingly, because it is apparent that the circuit court would have found no possible

neglect of the case regardless of the nature of the State's participation at the preliminary inquiry, we find that the error was harmless beyond a reasonable doubt, and that remand for a new *Krankel* hearing is unnecessary.

¶ 60                                    C. Constitutionality of AHC statute

¶ 61    The defendant's final argument concerns the constitutionality of the armed habitual criminal statute (720 ILCS 5/24-1.7 (West 2020))[1] under which he was convicted. The defendant contends that the statute violates the second amendment, both on its face and as applied to him, because under the test articulated by the United States Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) there is no historical founding-era analogue for a permanent status-based prohibition on the right to keep and bear arms applicable to convicted felons, such as himself. At a minimum, the defendant argues that under *Bruen*, such a prohibition is unconstitutional when applied to someone like him, who was previously convicted of at least one predicate nonviolent felony—in his case, residential burglary.

¶ 62    Initially, we note that the defendant's as-applied challenge to the statute is not forfeited. See *People v. Baker*, 2023 IL App (1st) 220328, ¶ 35 (and cases cited therein finding that the Illinois Supreme Court and the First, Second, and Third Districts of the Illinois Appellate Court have all held that a challenge to the constitutionality of a statute may be raised at any time and that this proposition applies equally to as-applied as to facial claims). Moreover, we observe that a

---

[1] At the time of the defendant's conviction the statute provided that "[a] person commits the offense of being an armed habitual criminal if he *** possesses *** any firearm having been convicted a total of 2 or more times of any combination" of certain enumerated qualifying offenses, including relevant to this appeal, aggravated discharge of a firearm, and "a forcible felony as defined in Section 2-8 of this Code"—in this case, as stipulated by the parties, residential burglary. 720 ILCS 5/24-1.7 (West 2020).

finding of constitutionality with respect to the defendant's as-applied challenge would necessarily also defeat his facial challenge because there would be at least one set of facts in which the challenged statute was constitutionally valid. *People v. Wade*, 2025 IL App (1st) 231683, ¶ 44; see also *People v. Garvin*, 219 Ill. 2d 104, 125 (2006). Accordingly, if we conclude that the statute is constitutional as applied to those convicted of nonviolent felonies, as the defendant asserts, he is, the defendant's facial challenge must also fail. Our review of the constitutionality of the armed habitual criminal statute is *de novo*. *Baker*, 2023 IL App (1st) 220328, ¶ 21.

¶ 63    The second amendment of the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has repeatedly interpreted the second amendment as creating an individual right "of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008); see also *Bruen*, 597 U.S. at 8-9 (2022); *McDonald v. Chicago*, 561 U.S. 742 (2010). In *Bruen*, the United States Supreme Court announced a new two-part test to be utilized in determining whether a statue violates that right. *Bruen*, 597 U.S. at 8-9. Under *Bruen*, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If it does not, then the statute does not violate the second amendment. *Id*. However, if the second amendment's plain text covers the regulated conduct, then the government must demonstrate that the statute "is consistent with the Nation's historical tradition of firearm regulation" because "the Constitution presumptively protects that conduct." *Id*.

¶ 64    The defendant's constitutional challenge to the armed habitual criminal statute, here, has been repeatedly considered and uniformly rejected by our courts since *Bruen*. See *People v. Grace*, 2025 IL App (1st) 232429-U, ¶ 13 (collecting cases). In addition, several of our courts

have considered the specific question of whether the armed habitual criminal statute is constitutional as applied to those convicted of nonviolent felonies and have concluded that it is. See, *e.g.*, *Id.* ¶ 17; *People v. Johnson*, 2025 IL App (3d)240185-U, ¶ 12, *People v. Hill*, 2025 IL App (1st) 231849-U, ¶ 20; *People v. Travis*, 2024 IL App (3d) 230113, ¶ 37; *Brooks*, 2023 IL App (1st) 200435, ¶ 100. We reach the same result here.

¶ 65     As noted above, the first step of the *Bruen* analysis is to determine whether the plain text of the second amendment covers the challenged conduct. See *Bruen*, 597 U.S. at 17. At present there is split in opinion among our courts as to whether the possession of a firearm is encompassed by the plain text of the second amendment. *People v. Macias*, 2025 IL App (1st) 230678, ¶ 28. While some courts have concluded that the second amendment does not apply to individuals who are not "law-abiding citizens" (see, *e.g.*, *Baker*, 2023 IL App (1st) 220328, ¶ 37; *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 20; *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21), others, like this panel, have concluded that the defendant's status as a felon is more appropriately considered under the second step of the *Bruen* analysis and that the challenged conduct under the statue, namely the possession of a firearm, is encompassed by the plain text of the second amendment. See *Brooks*, 2023 IL App (1st) 200435, ¶¶ 84-87 (finding that, for purposes of the armed habitual criminal statute, the "proscribed conduct" was the possession of a firearm, which is encompassed by the plain text of the second amendment (citing 720 ILCS 5/24-1.7 (West 2016)); *Macias*, 2025 IL App (1st) 230678, ¶ 28 (same); *People v. Doehring*, 2024 IL App (1st) 230384, ¶ 24 (finding that a focus on the conduct being proscribed instead of the circumstances surrounding such possession "better comports with the requirements in *Bruen*").

¶ 66     We agree with the State, however, that under the second step of the *Bruen* analysis, the armed habitual criminal statute is consistent with the historical tradition of firearm regulation. In

*Brooks*, we conducted an extensive analysis of the historical tradition related to the disarming of felons—violent and nonviolent—in comparison with the armed habitual criminal statute. See *Brooks*, 2023 IL App (1st) 200435, ¶¶ 90-105. We find the analysis contained therein amply supports a finding that the armed habitual criminal statute is consistent with the nation's history of firearm regulation and, therefore, agree with the numerous courts that have upheld the constitutionality of the statute under the second amendment. Accordingly, we affirm the defendant's armed habitual criminal conviction.

¶ 67                                    III. CONCLUSION

¶ 68    For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 69    Affirmed.